TOGUT, SEGAL & SEGAL LLP
Attorneys for Albert Togut,
Chapter 7 Trustee
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Frank A. Oswald
Richard K. Milin
Jonathan Ibsen

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
In re:                                             :    Chapter 7
                                                   :    Case No. 09-14994 (AJG)
ELLEN TRACY, LLC,                                  :
                                                   :
                            Debtor.                :
-------------------------------------------------------------------x
ALBERT TOGUT, as Chapter 7 Trustee                 :
of ELLEN TRACY, LLC,                               :
                                                   :    Adv. Pro. No. 09-[   ] (AJG)
                            Plaintiff,             :
                                                   :
- against -                                        :
                                                   :
HILCO CONSUMER CAPITAL, L.P.; HILCO               :
CONSUMER CAPITAL, LLC; CJ APPAREL GROUP,           :
LLC; ETPH ACQUISITION, LLC; BRAND MATTER,          :
LLC; WJ INVESTMENTS, LLC; FASHIONOLOGY             :
GROUP, LLC; STUART JAMIESON; BARRY                 :
STERNLICHT; MATTHEW EBY; JAMES J. SALTER;          :
JEFFREY B. HECKTMAN; KENNETH FINKELSTEIN;          :
ISAAC BENITAH; KENNETH RAGLAND;                    :
MARVIN TRAUB; WILLIAM SWEEDLER;                    :
MARK MENDELSON; and JAMES AMMEEN,                  :
                                                   :
                            Defendants.            :
-------------------------------------------------------------------x

## COMPLAINT TO (I) AVOID OBLIGATIONS PURSUANT TO 11 U.S.C. § 548 AND TO RECOVER AMOUNTS PURSUANT TO 11 U.S.C. § 550;  (II) TO RECOVER DAMAGES FOR BREACHES OF FIDUCIARY DUTIES;  AND (III) TO SUBORDINATE CLAIMS PURSUANT TO 11 U.S.C. § 510

TO THE HONORABLE ARTHUR J. GONZALEZ,
CHIEF BANKRUPTCY JUDGE:

Albert Togut, the Chapter 7 Trustee (the "Trustee" or "Plaintiff") of Ellen Tracy, LLC (the "Debtor"), by his attorneys, Togut, Segal & Segal LLP, as and for his complaint against the defendants identified below, alleges upon information and belief that:

## PRELIMINARY STATEMENT

By this adversary proceeding, the Trustee seeks to recover damages of more than $42 million from the Debtor's Controlling Parties[1] for breaches of their fiduciary duties. The Trustee also seeks to recover the value of fraudulent transfers exceeding $4 million and to subordinate claims of more than $6 million.

The gravamen of this Adversary Proceeding is that the Controlling Parties orchestrated the 2008 Transaction (defined below) and related material transactions which destroyed the Debtor and damaged its creditors. These breaches of fiduciary duties span the entire period between the Debtor's formation and the commencement of this case.

The Controlling Parties formed the Debtor as the central part of a series of transactions to acquire the Ellen Tracy business, which at the time of the 2008 Transaction had been operating as a profitable division of Liz Claiborne, Inc. The Controlling Parties then used the Ellen Tracy brand's venerable name and reputation, which dates back to the early 1950s, to transfer value to a failing affiliate.

Within a month of its formation, the Controlling Parties caused the Debtor to enter into a $40 million credit facility, and become obligated on approximately $32 million of pre-existing debt incurred by a pre-existing affiliate. When the Debtor became obligated on the credit facility, an affiliate of one of the Controlling Parties was

---

[1]     The Controlling Parties as referenced herein, include the Managers and the Board, each of which are defined below in paragraphs 78-79.

released from its guarantee under that credit facility.  The Debtor did not receive reasonable equivalent value for taking on the affiliate's debt or for the release of the guarantee.  Indeed, the Debtor did not receive any value in the transaction.

The Controlling Parties breached their fiduciary duties to the Debtor by rendering the Debtor insolvent, and leaving it grossly undercapitalized.  Moreover, the Controlling Parties totally disregarded any corporate formalities.  For example, the Controlling Parties had the same individual sign the credit facility for each of the parties to the credit facility, even though the entities had clearly conflicting and diverging interests.

The Controlling Parties made the Debtor a party to a one-sided license agreement with an affiliate.  The agreement contained exorbitant royalty fees, which the Debtor could never afford to pay.  The Controlling Parties further breached their fiduciary duties to the Debtor and its creditors by allowing another affiliate to use the Debtor's borrowing base under the existing credit facility for loans made to that affiliate, which created a liquidity crisis for the Debtor, and for which the Debtor received no equivalent value in return.

These breaches of fiduciary duties caused the Debtor to collapse when the Controlling Parties had the affiliate licensor issue a notice of default of the license agreement that terminated the Debtor's ability to sell Ellen Tracy goods.  This was the Debtor's death knell.

Rather than attempt any restructuring of the Debtor or conduct an orderly liquidation after the license default, the Controlling Parties sought to build inventory by continuing to receive goods from trade creditors, despite the Debtor's inability to pay for such post-default shipments.   While the Controlling Parties allowed the Debtor to

3

continue to incur more trade debt, they attempted to market the Ellen Tracy Brand to another licensee, solely for the benefit of the affiliates and the Controlling Parties.

The Controlling Parties' breaches of fiduciary duties continued even after the commencement of this case when they caused the Debtor to enter into a surrender agreement with its secured lender for the turnover of the Debtor's assets. The Controlling Parties did so without considering the effect of such surrender on the Debtor or its creditors.

The surrender agreement purports to waive potentially meritorious defenses that the Debtor could have asserted. Finally, as the surrender agreement was entered into in connection with the same credit facility on which the Debtor and its affiliates were obligated, the Controlling Parties breached their fiduciary duties to the Debtor and its creditors by failing to consider the effect of the Debtor's assets being used to satisfy an affiliate's obligation.

During the Debtor's entire existence, the Controlling Parties acted with complete disregard for the Debtor and its creditors, who have been left with almost $43 million in claims that the Debtor's estate is unable to satisfy.

## NATURE OF THIS ACTION

1.      Since the Debtor's formation in March 2008, it was dominated and controlled by the Controlling Parties through ETPH Acquisition, LLC ("ETPH"), the Debtor's ultimate parent.

2.      The Controlling Parties repeatedly acted with complete disregard for the Debtor and its creditors, and repeatedly caused the Debtor to enter into transactions that benefited the Controlling Parties and the Debtor's affiliates at the Debtor's expense.

3.     On April 9, 2008, the Controlling Parties caused the Debtor to enter into the Amended and Restated Revolving Credit and Security Agreement, (the "Amended Credit Agreement") with Wells Fargo Century, Inc. ("Wells"), and thereby become obligated on over $32 million of pre-existing debt owed by CJ Apparel Group, LLC ("CJAG"), an affiliate managed and controlled by the Controlling Parties, for which the Debtor did not receive any reasonably equivalent value.

4.     At the same time, on April 9, 2008, Hilco Consumer Capital, LLC ("HCC LLC"), an affiliate of one of the Controlling Parties, was released from its guarantee obligation of $4.25 million of the same pre-existing debt.

5.     The Amended Credit Agreement was part of a series of transactions (collectively, the "2008 Transaction"), memorialized in the Asset Purchase Agreement between Liz Claiborne, Inc. ("Claiborne") and ETPH, dated as of February 13, 2008 (the "APA") and related documents, which established the Debtor's corporate structure and operations.

6.     The Controlling Parties breached their fiduciary duties to the Debtor by ignoring the effect of the 2008 Transaction on the Debtor or its creditors, and continued to breach their fiduciary duties throughout the Debtor's existence by failing to consider the effect of any transaction or any of their actions on the Debtor or its creditors.

7.     The Controlling Parties further breached their fiduciary duties to the Debtor by causing the Debtor to enter into a license agreement, dated April 9, 2009 with Brand Matter, an affiliate, (the "License Agreement"), which required the Debtor to pay very significant licensing fees for the right to use the Ellen Tracy brand name which the Debtor could not afford to pay.

8.      Likewise, the Controlling Parties breached their fiduciary duties to the Debtor by causing the Debtor to enter into the Amended Credit Agreement, and continued to breach their fiduciary duties throughout the Debtor's existence by taking actions which benefited the Debtor's affiliates at the expense of the Debtor and its creditors.

9.      Finally, once the Debtor's inability to pay licensing fees led its affiliates to deny the Debtor the right to use the Ellen Tracy brand name, and the Debtor was forced to cease operations, the Debtor was made to sacrifice for its affiliates:  the Debtor's lender seized approximately $5 million of the Debtor's money, and asserted a secured claim for $10 million more, to pay its affiliate's debts under the terms of the Amended Credit Agreement.

10.     The Debtor's trade creditors, in contrast, have been left unpaid.

## THE PARTIES

### Plaintiff

11.     Plaintiff was appointed as the Chapter 7 Interim Trustee for the Debtor on October 7, 2009, accepted his appointment, duly qualified, and is acting as Trustee of the Debtor.

### The Debtor

12.     The Debtor is a Delaware limited liability company that was formed on March 3, 2008.

13.     From on or about April 9, 2008 until the commencement of this Bankruptcy Case, the Debtor was engaged in the sale and marketing of clothing bearing the Ellen Tracy brand name.

14.     The Debtor was formed as, and continues to be, a wholly owned subsidiary of its sole member Fashionology Group, LLC ("Fashionology").

6

15.     From the date of the Debtor's formation until October 6, 2009 (the "Relevant Period"), the Debtor had no board of directors or board of representatives.

16.     The Debtor's sole member, Fashionology, also had no board of directors or board of representatives at any time during the Relevant Period.

17.     Throughout the Relevant Period, the Debtor was managed by its ultimate parent, ETPH, the sole member of Fashionology.

18.     ETPH made all board-level decisions concerning the management of the Debtor during the Relevant Period, and the ETPH board of representatives functioned as the board of representatives of the Debtor.

19.     On August 14, 2009 (the "Filing Date"), certain of the Debtor's creditors filed an involuntary petition for relief under Chapter 7 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code") against the Debtor in this Court.

20.     An Order for Relief under Chapter 7 of the Bankruptcy Code was entered in this case on October 6, 2009 (the "Order for Relief").

**The Defendants**

A.     The Hilco Defendants

21.     Defendant Hilco Consumer Capital, L.P. ("Hilco") is a Delaware limited partnership that was formed on April 2, 2008.

22.     Hilco is a member of ETPH.

23.     ETPH's Amended and Restated Limited Liability Company Agreement dated as of April 9, 2008 designates Hilco as one of ETPH's lead members.

24.     At all times during the Relevant Period, Hilco was one of ETPH's two lead members (Hilco, collectively with WJ Investments, LLC, the "Lead Members").

25.      At all times from and after the formation of ETPH, Hilco has owned an interest in ETPH.

26.      Defendant HCC LLC is a Delaware limited liability company that was formed on December 8, 2006.

27.      On information and belief, HCC LLC is an affiliate of Hilco.

B.      WJ Investments, LLC

28.      Defendant WJ Investments, LLC ("WJ") is a Delaware limited liability company that was formed on July 17, 2000.

29.      Upon information and belief, at least 50% of WJ Investments is owned by defendant William Sweedler ("Sweedler").

30.      Sweedler is a manager of WJ.

31.      WJ is a member of ETPH.

32.      At all times during the Relevant Period, WJ was one of ETPH's two Lead Members.

33.      At all times since the formation of ETPH, WJ has owned an interest in EPTH.

C.      ETPH

34.      ETPH is a Delaware limited liability company that was formed on February 12, 2008.

35.      Upon information and belief, ETPH is a holding company.

36.      ETPH was formed in connection with the 2008 Transaction.

37.      ETPH is managed by its Lead Members and the Board.

38.      ETPH is the sole member of Fashionology, the sole member of the Debtor, and has been since Fashionology's formation.

8

39.      ETPH is also the sole member of Brand Matter, LLC ("Brand Matter"), an affiliate of the Debtor, and has been since Brand Matter's formation.

40.      ETPH is the ultimate parent of Brand Matter;  Fashionology; CJAG and the Debtor (collectively, the "ETPH Affiliates").

D.      Brand Matter

41.      Defendant Brand Matter is a Delaware limited liability company that was formed on February 27, 2008.

42.      Upon information and belief, Brand Matter owns and licenses various intellectual properties.

43.      Since its formation, Brand Matter has had no board of directors or board of representatives.

44.      ETPH is Brand Matter's sole member.

45.      ETPH has managed Brand Matter since its formation.

46.      All board-level decisions concerning the management of Brand Matter were made by the ETPH board of representatives.

E.      Fashionology

47.      Defendant Fashionology is a Delaware limited liability company that was formed on February 27, 2008.

48.      Upon information and belief, Fashionology is a holding company with no business operations of its own.

49.      Fashionology is the sole member of both the Debtor and the CJAG.

50.      Since its formation, Fashionology has had no board of directors or board of representatives.

51.      EPTH has managed Fashionology since February 27, 2008.

9

52.     All board-level decisions concerning the management of Fashionology were made by the ETPH board of representatives.

F.     CJAG

53.     Defendant CJAG is a Delaware limited liability company that was formed on December 8, 2006.

54.     Upon information and belief, CJAG markets and sells clothing bearing the Caribbean Joe brand name.

55.     CJAG's sole member is Fashionology.

56.     All board-level decisions concerning the management of CJAG were made by the ETPH board of representatives during the Relevant Period.

G.     Individual Defendants

57.     Defendant Sweedler was appointed as a member of ETPH's board of representatives as of April 9, 2008, and remained a member throughout the Relevant Period.

58.     Sweedler was also the Chief Executive Officer of the Debtor, ETPH, Brand Matter and Fashionology throughout the Relevant Period.

59.     Sweedler owned membership units in ETPH and equity interests in certain investors in ETPH throughout the Relevant Period.

60.     Sweedler also acted as a "managing member" for each of ETPH and Fashionology on at least one occasion during the Relevant Period and, upon information and belief, was Co-Chairman of Brand Matter throughout the Relevant Period.

61.     Defendant James J. Salter ("Salter") was a member of ETPH's board of representatives at times during the Relevant Period.

62.     Salter was the Chief Executive Officer of Hilco throughout the Relevant Period and, upon information and belief, Co-Chairman of Brand Matter throughout the Relevant Period.

63.     Defendant Stuart Jamieson ("Jamieson") was appointed as a member of ETPH's board of representatives as of April 9, 2008, and remained a member throughout the Relevant Period.

64.     Jamieson was also the President and Secretary of the Debtor, ETPH, Brand Matter and Fashionology throughout the Relevant Period.

65.     Jamieson acted as a "managing member" for each of ETPH and Fashionology on at least one occasion during the Relevant Period.

66.     Defendant Barry Sternlicht ("Sternlicht") was appointed as a member of ETPH's board of representatives as of April 9, 2008, and remained a member throughout the Relevant Period.

67.     Defendant Matthew Eby ("Eby") was appointed as a member of ETPH's board of representatives as of April 9, 2008, and remained a member throughout the Relevant Period.

68.     Defendant Jeffrey B. Hecktman ("Hecktman") was appointed as a member of ETPH's board of representatives as of April 9, 2008, and remained a member throughout the Relevant Period.

69.     Upon information and belief, Hecktman was the Chairman and Chief Executive Officer of Hilco Trading, LLC, Hilco's managing member, throughout the Relevant Period.

70.     Defendant Kenneth Finkelstein ("Finkelstein") was appointed as a member of ETPH's board of representatives as of April 9, 2008, and remained a member throughout the Relevant Period.

71.    Defendant Isaac Benitah ("Benitah") was appointed as a member of ETPH's board of representatives as of April 9, 2008, and remained a member throughout the Relevant Period.

72.    Defendant Marvin Traub ("Traub") was appointed as a member of ETPH's board of representatives as of April 9, 2008, and remained a member throughout the Relevant Period.

73.    Defendant Mark Mendelson ("Mendelson") was a member of ETPH's board of representatives at times during the Relevant Period.

74.    Defendant James Ammeen ("Ammeen") was a member of ETPH's board of representatives at times during the Relevant Period.

75.    Defendant Kenneth Ragland ("Ragland") was a member of ETPH, as well as, the Chief Operating Officer and Treasurer of the Debtor, ETPH, Brand Matter and Fashionology at times during the Relevant Period.

76.    Ragland was also the Chief Operating Officer and Chief Financial Officer of CJAG throughout the Relevant Period.

77.    Ragland signed the Amended Credit Agreement on behalf of the Debtor, CJAG and Fashionology as their Chief Operating Officer/Chief Financial Officer.

78.    The Managers of the Debtor during the Relevant Period, were:

    a.    Ragland;

    b.    Fashionology, which had the authority to make decisions for the Debtor in its capacity as the sole member of the Debtor;

    c.    ETPH, which actually controlled the Debtor in its capacity as the sole member of the Debtor's sole member Fashionology;

    d.    Hilco and WJ, who were the Lead Members of ETPH, which managed and made all business decisions for the Debtor;

     e.     Sweedler, who at times during the Relevant Period, was a member of ETPH's board of representatives and an officer of the Debtor, Brand Matter and Fashionology;  and

     f.     Jamieson, who at times during the Relevant Period, was a member of ETPH's board of representatives and an officer of the Debtor, Brand Matter and Fashionology.

79.     Sweedler, Jamieson, Sternlicht, Eby, Salter, Hecktman, Finkelstein, Benitah, Traub, Mendelson and Ammeen are collectively referenced herein as the "Board."

## JURISDICTION AND VENUE

80.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a), 157(b) and 1334(b).

81.     This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B) (E), (H), (K), and (O).

82.     Venue of this adversary proceeding is proper in this Court pursuant to 28 U.S.C. § 1409(a).

83.     Plaintiff commences this adversary proceeding seeking relief pursuant to §§ 510, 548 and 550 of Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code"), and Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

84.     The Defendants' self-dealing proximately led to the Debtor's demise and has its genesis in HCC LLC and Sweedler's prior equity interests in CJAG.

85.     On information and belief, in December 2006, HCC LLC formed a group of investors (the "2006 Investor Group") which acquired the then existing equity of CJAG (the "2006 Acquisition").

86.    After its formation, CJAG marketed and sold clothing bearing the Caribbean Joe brand name, and owned the related intellectual property.

87.    HCC LLC controlled CJAG after its formation in 2006.

88.    Sweedler, either directly or through an entity controlled by him, was a member of the 2006 Investor Group.

89.    As part of the 2006 Acquisition, on December 26, 2006, CJAG, as borrower, entered into a Revolving Credit and Security Agreement with Wells, as agent for the lenders (the "Original Credit Agreement").

90.    The Original Credit Agreement provided CJAG with a $40 million revolving credit facility secured by a lien against all of CJAG's assets.

91.    The Original Credit Agreement was also secured by a limited guarantee executed by HCC LLC in the amount of $4,250,000.

92.    Upon information and belief, late in 2007, CJAG experienced a liquidity crisis, and CJAG was reaching its borrowing limits under the Original Credit Agreement.

**The 2008 Transaction**

93.    During the last quarter of 2007, Sweedler and Jamieson entered into negotiations with Hilco to acquire the Ellen Tracy business and brand name from Claiborne.

94.    The acquisition of the Ellen Tracy business and brand name formed the basis of the 2008 Transaction.

95.    The final piece of the 2008 Transaction closed on April 9, 2008 (the "Closing Date").

96.    Upon information and belief, Sweedler, Jamieson and Hilco intended to use the 2008 Transaction to, *inter alia,* improve CJAG's liquidity.

97.    On February 12, 2008, Sweedler and Jamieson formed ETPH.

98.    On February 13, 2008, ETPH and Claiborne entered into the APA.

99.    The APA provided, *inter alia,* that ETPH would purchase substantially all of Claiborne's Ellen Tracy assets for approximately $27.3 million (the "Purchase Price"), plus up to $15 million in contingent additional consideration (the "Additional Consideration").

100.    The Purchase Price was funded by Brand Matter with the proceeds of a $30 million loan from Wells and Israel Discount Bank of New York, LLC ("IDB").

101.    The APA further provides that payment of the Additional Consideration was contingent upon the performance of the Ellen Tracy business.

102.    Prior to the closing of the 2008 Transaction, on or about February 29, 2008, Houlihan Lokey issued a report (the "Houlihan Lokey Report") to IDB, which stated that the Ellen Tracy intellectual property (the "Ellen Tracy IP") had a value of at least $30,900,000.

103.    The Houlihan Lokey Report also stated that CJAG's intellectual property had a value of at least $25,500,000.

104.    On March 3, 2008, ETPH issued the ETPH Private Offering Memorandum (the "Offering Memorandum") offering to sell 50,000 Class A Units of ETPH for $1,000 per unit.

105.    The Offering Memorandum set forth the material terms of the 2008 Transaction, including, *inter alia*, that:

    a.    ETPH would acquire the outstanding membership interests of CJAG from the then existing CJAG equity holders for $34,670,000;

    b.    ETPH had been organized to purchase the operating and intellectual property assets of the Ellen Tracy brand (the

"Ellen Tracy Business") from Claiborne pursuant to the terms the APA;

c.    the intellectual property assets and operating assets of the Ellen Tracy Business would be separated, and held by different wholly-owned subsidiaries of ETPH;  and

d.    the intellectual property assets and operating assets of CJAG would be separated, and held by different wholly-owned subsidiaries of ETPH.

106.    The Managers and the Board failed to ensure that the 2008 Transaction provided adequate capitalization for the Debtor.

107.    The impending closing of the 2008 Transaction placed the Debtor in the zone of insolvency.

108.    The Managers and the Board therefore owed fiduciary duties to the Debtor and its creditors from the time the 2008 Transaction was being negotiated.

109.    Neither the Board nor the Managers considered the effect of the 2008 Transaction on the Debtor or its Creditors.

110.    By failing to consider the effect of the 2008 Transaction on the Debtor and its Creditors, the Board and the Managers neglected their duties to the Debtor and its creditors.

111.    The 2008 Transaction created the following corporate structure:

a.    Hilco and WJ, together with other investors, owned equity in ETPH;

b.    ETPH was the sole member of both Brand Matter and Fashionology;

c.    Fashionology was the sole member of both the Debtor and CJAG; and

d.    Brand Matter owned the Ellen Tracy IP that had formerly belonged to Claiborne's Ellen Tracy Business, including the Ellen Tracy name.  Brand Matter also owned the intellectual property that had formerly belonged to CJAG.

16

112.     The closing of the 2008 Transaction, including the Debtor's entry
into the Amended Credit Agreement, rendered the Debtor insolvent.

113.     Defendants WJ and Hilco were each paid at least $750,000 in fees in
connection with the 2008 Transaction by ETPH.

114.     Marvin Traub & Associates, an affiliate of Traub, was paid at least
$100,000 in fees in connection with the 2008 Transaction by ETPH.

**The License Agreement**

115.     The 2008 Transaction divided the Ellen Tracy Business assets into
two groups:  (i) Ellen Tracy's business operations which were transferred to the Debtor;
and (ii) its brand name and related IP rights which were transferred to Brand Matter.

116.     According to the Houlihan Lokey Report, the Ellen Tracy IP that
had belonged to Claiborne's Ellen Tracy Business was worth almost ten times as much
as the value of the Ellen Tracy business operations at the time.

117.     As part of the 2008 Transaction, the Debtor's Managers made the
Debtor a party to a License Agreement, which required, *inter alia*, that the Debtor would
pay Brand Matter a royalty of 7% of its "Net Wholesale Sales" plus 5% of its "Net Retail
Sales," as those terms are defined in the License Agreement.

118.     The License Agreement also required the Debtor to pay Brand
Matter a minimum annual royalty irrespective of its sales, and calculated, for the first
year of the Licensing Agreement, as:

a.     $3,412,500 for wholesale sales;

b.     $375,000 per quarter for outlet sales;  and

c.     2% of sales in advertising fees.

17

119. The obligations that the Managers imposed on the Debtor through the Licensing Agreement in favor of Brand Matter made it more likely that the Debtor would have insufficient capital to pay its creditors.

120. Upon information and belief, the Managers imposed royalties and fees that were higher than those in comparable transactions in the market at the time.

121. Because the Debtor was undercapitalized, the Debtor's Managers knew or should have known that the Debtor could not afford to pay the royalties and fees to Brand Matter.

122. Based on the License Agreement and the forecasts available to ETPH at the time, the Managers projected, or should have projected, that the Debtor would owe a minimum royalty of $3,412,500 for wholesale sales, $1,125,000 for outlet sales and $90,750 in advertising fees, totaling $4,628,250 for the post-acquisition period of 2008.

123. On an annualized basis, this would have amounted to over 40% of 2007 EBITDA for the Ellen Tracy Business when it was part of Claiborne, and 90% of projected net profits for the Debtor before licensing expense for the year 2008.

124. The revenue from the License Agreement ultimately was up-streamed to ETPH, an insider of the Debtor.

125. Absent a significant capital infusion, the License Agreement made the Debtor unable to pay current operating expenses.

126. Neither ETPH's Lead Members, nor the Board, nor the other Managers considered whether entry into the License Agreement made the Debtor's Operations unlikely to be viable.

18

127.    The Managers' lack of fiduciary concern for the Debtor - - and the inherent conflicts of interest - - are made clear by the signatories to the License Agreement itself.

128.    The License Agreement was signed by Sweedler as Chief Executive Officer of **both** the Debtor and Brand Matter.

129.    The License Agreement benefitted Brand Matter, and harmed the Debtor, by *inter alia,* providing for the payment of inordinately high license fees, which the Debtor could not afford to pay.

## The Amended Credit Agreement

A.    The Terms of the Amended Credit Agreement

130.    Prior to the Closing Date, CJAG was a party to the Original Credit Agreement.

131.    CJAG pledged its assets, including its intellectual property assets, to secure its obligations under the Original Credit Agreement.

132.    As security for the Original Credit Agreement, HCC LLC provided a guarantee in favor of Wells of $4,250,000 of CJAG's obligations under the Original Credit Agreement (the "Hilco Guarantee").

133.    As part of the 2008 Transaction, the Debtor, CJAG and Wells entered into the Amended Credit Agreement dated as the Closing Date of the 2008 Transaction.

134.    The Amended Credit Agreement replaced the Original Credit Agreement.

135.    The Amended Credit Agreement required the Debtor to acknowledge that it was "indebted" to Wells Fargo for approximately $32 million of its

new affiliate CJAG's pre-existing obligations under the Original Credit Agreement (the "Pre-existing Debt").

136.    Section 16.16(b) of the Amended Credit Agreement provides, among other things: "Each borrower hereby acknowledges, confirms and agrees that such Borrower is indebted to [Wells Fargo] for loans and advances under the [Original Credit Agreement], as of the close of business as of April 7, 2008, in the aggregate principal amount of $30,395,000 and the aggregate amount of $2,430,000 in respect of Letters of Credit…."

137.    Fashionology was a guarantor of the total indebtedness under the Amended Credit Agreement.

138.    CJAG provided no consideration to the Debtor for the Debtor becoming obligated on the Pre-existing Debt.

139.    In addition, the Amended Credit Agreement limited the Debtor's right to borrow based upon the amount of CJAG's outstanding indebtedness and a $1 million reserve.

140.    Although the face amount of the Amended Credit Agreement was $40 million, the Debtor did not have the contractual right to borrow more than $7 million on the date the Amended Credit Agreement was signed.

141.    The face amount of the Amended Credit Agreement was increased to $50 million in June 2008 to reflect the participation of IDB.

142.    CJAG was insolvent as of the date of the Amended Credit Agreement and remained insolvent throughout the remainder of the Relevant Period.

143.    CJAG was inadequately capitalized to fund its own business as of the Closing Date and had a negative tangible net worth as of that date.

144.    The Amended Credit Agreement, therefore, obligated the Debtor for more than $32 million owed by CJAG to Wells that CJAG was unable to pay.

145.    The Amended Credit Agreement purported to pledge all of the Debtor's assets as collateral to secure the payment of both CJAG's and the Debtor's obligations to Wells as agent.

146.    In exchange, and upon information and belief at Hilco's and other Managers' request, Wells relieved the Hilco Guarantee upon the Debtor's entry into the Amended Credit Agreement.

147.    As a result, Hilco in effect transferred its $4.25 million obligation to the Debtor, which the Debtor assumed for less than reasonably equivalent value.

148.    Hilco provided no consideration to the Debtor in exchange for its release from the Hilco Guarantee.

149.    Upon information and belief, at CJAG's and the Managers' request, Wells released its security interest in CJAG's intellectual property assets under the Original Credit Agreement in exchange for the Managers' pledge of the Debtor's assets to Wells.

150.    As a result of its entry into the Amended Credit Agreement, the Debtor in effect assumed secured obligations owed by CJAG under the Original Credit Agreement, and CJAG was able to transfer its intellectual property assets to its affiliate, Brand Matter, free and clear of Wells' security interest.

151.    CJAG and Brand Matter provided no consideration to the Debtor in exchange for the release of the Wells' security interest in CJAG's intellectual property.

152.    HCC LLC and CJAG benefited from the 2008 Transaction and the Debtor's entry into the Amended Credit Agreement at the expense of the Debtor and its creditors.

21

153.    The Amended Credit Agreement caused the Debtor substantial and immediate harm:  it pledged all of the Debtor's assets as collateral for the payment of multi-million dollar obligations of the Debtor's Managers and its affiliates, and rendered the Debtor insolvent.

B.    Failure To Consider the Debtor's or Its Creditors' Interests
      Before Entering into the Amended Credit Agreement

154.    Neither the Managers nor the Board held meetings to consider whether the Amended Credit Agreement would be beneficial or detrimental to the Debtor and its creditors.

155.    Neither the Managers nor the Board held meetings to consider whether or any part of the 2008 Transaction would be beneficial or detrimental to the Debtor and its creditors.

156.    The Amended Credit Agreement was signed by Ragland as Chief Operating Officer/Chief Financial Officer of all of Fashionology, CJAG and the Debtor.

157.    The respective interests of Fashionology, CJAG and the Debtor conflicted with respect to the Amended Credit Agreement with respect to, *inter alia*, the Debtor's assumption of the Pre-existing Debt.

158.    Upon information and belief, neither any of the Managers nor any members of the Board took any steps during the Relevant Period to investigate whether the Debtor could obtain alternative financing that would not have required it to assume pre-existing multi-million dollar obligations owed by a different entity.

159.    Upon information and belief, none of the Managers or the Board consulted any bank or other source of funding during the Relevant Period to evaluate whether a credit agreement could be available to the Debtor that did not include CJAG as a party.

160.    Upon information and belief, the Debtor could have obtained alternative financing at the time the Amended Credit Agreement was entered into that would not have rendered the Debtor insolvent and that would have been financially beneficial to the Debtor.

**The Managers' Ratifications of Entry into the Amended Credit Agreement**

161.    Despite the Managers' and Board's lack of meetings to consider the effect of any part of the 2008 Transaction on the Debtor or its creditors, Managers Hilco and WJ each ratified all of the prior actions of their appointees to the Board as of August 8, 2008.

162.    In a letter dated August 8, 2008, Hilco informed ETPH that, "James J. Salter, Jeffrey B. Hecktman, Kenneth Finkelstein and Isaac Benitah are each named as HCC Representatives [to the ETPH board of representatives] as of April 9, 2008 and any actions taken by such individuals since such date are hereby ratified."

163.    Similarly, in a letter dated August 8, 2008, WJ (then known as "RJW Investments LLC") informed ETPH that, "William Sweedler, Barry Sternlicht, Stuart Jamieson and Matthew Eby are each named as RJW Representatives [to the ETPH board of representatives] as of April 9, 2008 and any actions taken by such individuals since such date are hereby ratified."

164.    The August 8, 2008 letters from Hilco and WJ, *inter alia*, ratify their appointees' earlier actions with respect to entry into the Amended Credit Agreement, without indicating that either Hilco or WJ considered whether their appointees' actions considered the effects on the Debtor or its creditors.

165.    Evaluated as of August 8, 2008, entry into the Amended Credit Agreement was not beneficial to the Debtor or its creditors.

23

166.   As of August 8, 2008, CJAG was still insolvent, and the Debtor was rendered insolvent by its obligations as stated in the Amended Credit Agreement.

167.   By August 8, 2008, Fashionology was insolvent.

168.   Hilco and WJ expressly approved all of their appointed ETPH Board members' actions in August 2008, including the members' actions with respect to the Amended Credit Agreement, even though those actions harmed the Debtor and its creditors.

169.   By August 8, 2008, the Debtor had numerous trade creditors as well as additional claims for payment from employees and unpaid landlords.

170.   On August 21, 2009, more than one year after such ratifications, and a week after the Filing Date, the Members of ETPH signed a written consent stating that:

> all acts, transactions or agreements undertaken, prior to [August 21, 2009], by the Co-Managers or any of the officers or representatives of [ETPH], are hereby ratified, approved and confirmed (the "ETPH Ratification").

171.   By the date of the ETPH Ratification, the Debtor was already the subject of this involuntary Chapter 7 liquidation proceeding.

172.   At a minimum, the Managers should have sought and entered into a more favorable credit agreement for the Debtor.

**The Managers' Continued Looting of the Debtor for the Benefit of Insiders**

173.   Throughout the Relevant Period, the Managers and the Board continued to breach their fiduciary duties to the Debtor and its creditors.

174.   CJAG used the Debtor's borrowing base under the Amended Credit Agreement to obtain loans made to itself.

175.    The effect of allowing CJAG to borrow funds under the Amended Credit Agreement based upon the Debtor's borrowing availability caused the Debtor to suffer a liquidity crisis.

176.    The Managers and the Board failed to protect the Debtor and its creditors from CJAG's looting of the Debtor's liquidity, which ultimately benefitted ETPH.

177.    CJAG's borrowings on the Debtor's Borrowing Base were a contributing factor in causing the Debtor to default on its obligations under the License Agreement to its Affiliate, Brand Matter.

178.    On January 15, 2009, Brand Matter issued a notice of default (the "License Default Notice"), which stated, *inter alia,* that the Debtor had defaulted under the License Agreement by failing to pay royalties and other sums totaling $6,404,000.

179.    The License Default Notice further advised the Debtor that the License would terminate if the Debtor failed to cure those defaults "within five days after [the Debtor's receipt of the] notice."

180.    Upon information and belief, the Debtor was unable to cure its alleged defaults under the License Agreement in part because of CJAG having borrowed funds under the Amended Credit Agreement that would otherwise have been available to the Debtor.

181.    Thereafter, the Board continued to ignore its fiduciary duties to the Debtor and its creditors by allowing the Debtor to incur new trade debt even though the Debtor was no longer licensed to market and sell goods bearing the Ellen Tracy brand.

182.    Although having no right to continue to market the Ellen Tracy Brand as of January 2009, the Managers continued to operate the Debtor and created the illusion that the Debtor was a viable entity.

183.    The Debtor continued to receive goods from trade vendors and correspondingly increase its trade debt.

184.    Even though the License Agreement had been terminated, the Managers failed to develop a plan to liquidate the Debtor's operations.

185.    The Managers should have acted to "staunch the bleeding," and should have kept their purchases to a minimum to keep the Debtor's payables low.

186.    Upon information and belief, the Managers engaged in the aforementioned conduct to increase their options for finding a new licensee, and to maximize the remaining ETPH Affiliates' profits.

187.    Even though the Debtor required more capital if it was to survive, and even though the Managers siphoned value from the Debtor by means of the License Agreement, the Managers did not contribute, or cause others to contribute, the capital necessary to keep the Debtor in business.

**The "Peaceful Surrender" Agreement and the Debtor's Bankruptcy**

188.    After the Filing Date but before the Order for Relief in this case was entered, the Debtor executed and delivered to Wells a letter agreement dated September 1, 2009 and titled "Peaceful Possession of Collateral" (the "Surrender Agreement").

189.    The Surrender Agreement is signed for the Debtor by James Salter, CEO, Hilco Consumer Capital, LLC, Lead Member, ETPH Acquisition, LLC Authorized Signatory.  The only other signature line is provided for Wells Fargo Trade Capital Services, Inc. as Agent.

190.    The Debtor was insolvent when it entered into the Surrender

Agreement.

A.    Terms of the Surrender Agreement

191.    The Surrender Agreement provides, *inter alia*, that the Debtor

"acknowledges, confirms and agrees" that it is indebted to Wells "jointly and severally

with CJAG … in the aggregate amount of not less than $9,743,659, plus accrued and

unpaid interest thereon and all other costs, expenses, attorney's fees and other charges

or contractual obligations … all of which are unconditionally due and owing … without

offset, recoupment, defense or counterclaim of any kind …."

192.    The Surrender Agreement provides that Wells  shall have a "first

priority perfected liens upon and security interests in its properties…."

193.    The Surrender Agreement further provides that that the Debtor

"hereby surrenders, delivers, and grants to Agent for the benefit of Lenders, peaceful

possession of the Collateral "including "accounts, contract rights, purchase orders,

instruments, chattel paper, brand names, equipment, inventory, computer equipment,

and the products and proceeds thereof…."

194.    Pursuant to the Surrender Agreement, Wells seized approximately

$5 million of the Debtor's cash.

195.    Wells also filed a proof of claim in this Bankruptcy Case, asserting

secured claims against the Debtor for sums totaling approximately $10 million.

B.    The Board's Approval of the Surrender Agreement

196.    Minutes of a meeting of the Board dated August 28, 2009 concern

entry into the Surrender Agreement (the "August 2009 Minutes").

197.    The August 2009 Minutes do not provide any indication that the

interests of the Debtor or its creditors were considered separately from the interests of

27

its affiliates:  the Board was advised by counsel to all of "Fashionology, LLC, Ellen

Tracy, LLC and CJ Apparel Group, LLC," even though those entities had conflicting

interests.

198.    The August 2009 Minutes further reflect that the Board determined

that "it would be in the best interests of … Fashionology and its subsidiaries to approve

the transfer of the Ellen Tracy inventory to Wells Fargo…."

199.    Upon information and belief, the Board did not consider the

interests of the Debtor and its creditors separately.

200.    Upon information and belief, the Board did not consider:  (i)

whether the Debtor was in fact "jointly and severally liable" for the $9,743,659 of CJAG

debt;  (ii) whether surrender of the Collateral was actually required under the Amended

Credit Agreement;  (iii) whether entry into the Surrender Agreement was proper and

reasonable after the Petition Date;  or (iv) whether entry into the Surrender Agreement

would be harmful to the Debtor or its creditors.

201.    The Debtor, Fashionology and CJAG were all represented by the

same counsel at the August 28, 2009 meeting, creating a conflict of interest.

C.    <u>Consequences of the Surrender Agreement</u>

202.    The terms of the Surrender Agreement purports to waive

potentially meritorious defenses that the Debtor could have asserted against Wells'

demand to seize the Debtor's property to satisfy, *inter alia*, certain of its own and

CJAG's obligations under the Amended Credit Agreement.

203.    Further, the Surrender Agreement fails to provide sufficient consid-

eration to the Debtor to justify its surrender of the Debtor's property and rights.

204.    The Surrender Agreement states that "Wells Fargo has indicated

that it would … liquidate the inventory in accordance with [the Debtor's] anticipated

28

plan" and approves the Surrender Agreement "with the caveat that the documents …
incorporate language to reflect that Wells Fargo will pay all operating costs related to
the business until such time as the outlet sorts are permanently close[d]."

205.    The Surrender Agreement was a material, outside the ordinary
course transaction.

206.    The Surrender Agreement was not approved by this Bankruptcy
Court.

207.    The August 2009 Minutes indicate that eleven members of the
Board voted in favor of entry into the Surrender Agreement and that none were
opposed.

208.    The Surrender Agreement benefited Fashionology at the Debtor's
and its creditors' expense because it reduced Fashionology's exposure to pay Wells
some or all of CJAG's debts under guarantees.

209.    Upon information and belief, the Surrender Agreement benefited
ETPH and Brand Matter at the Debtor's and its creditors' expense by reducing sums
those entities otherwise would have been required to pay – or believed they would
have been required to pay.

210.    As a result of the Surrender Agreement, on September 4, 2009,
Fashionology, Wells and Hilco Merchant Resources entered into an agreement
governing inventory disposition (the "Hilco Inventory Agreement"), pursuant to which,
among other things, it was agreed that Hilco Merchant Resources would conduct
liquidation sales of the Debtor's collateral on behalf of Wells.

211.    Upon information and belief, Hilco Merchant Resources is an
affiliate of Hilco.

212.    The Surrender Agreement and the Hilco Inventory Agreement benefited Hilco at the Debtor's expense by allowing it to profit from liquidating certain of the Debtor's inventory and assets by agreement with Wells.

213.    For the foregoing reasons, entry into the 2008 Transaction, the APA and related documents, the Amended Credit Agreement, the Surrender Agreement, and other actions and omissions of the Board and the Managers improperly benefitted the Debtor's insiders and Managers, and damaged the Debtor and its creditors.

**FIRST CAUSE OF ACTION
AGAINST HCC LLC
(Recovery of Value of Fraudulent Transfer
Pursuant to 11 U.S.C. §§ 548(a) and 550)**

214.    Plaintiff repeats, realleges and incorporates by reference the allegations contained in paragraphs 1 through 213 of this Complaint as though set forth at length herein.

215.    On April 9, 2008, the Debtor assumed an obligation to Wells that had formerly been guaranteed by HCC LLC when the Debtor entering into the Amended Credit Agreement.

216.    The Debtor entered into the Amended Credit Agreement within two (2) years prior to the Petition Date.

217.    The Amended Credit Agreement made the Debtor, in effect, the new guarantor on what had been HCC LLC's $4.25 million guarantee of CJAG's debt to Wells.

218.    Prior to the Debtor's entering into the Amended Credit Agreement, HCC LLC was a guarantor of $4,250,000 of CJAG's obligations under the Credit Agreement.

219.    HCC LLC was relieved of its Guarantee at the expense of the Debtor becoming obligated on the Amended Credit Agreement.

220.    Upon information and belief, HCC LLC would not have been released from its Guarantee, absent the Debtor becoming obligated on, and pledging its assets under, the Amended Credit Agreement.

221.    HCC LLC directly and materially benefitted from the Debtor's assuming what had been HCC LLC's guarantee obligation under the Original Credit Agreement.

222.    The Debtor received less than reasonably equivalent value from HCC LLC for becoming a substitute obligor for HCC LLC under the Amended Credit Agreement.

223.    The Debtor received less than equivalent value for HCC LLC being released from the Guarantee and in exchange for the Debtor entering into the Amended Credit Agreement.

224.    For the reasons alleged above, the Debtor:  (i) was insolvent on April 9, 2008, or (ii) became insolvent as a result of entering into the Amended Credit Agreement;  or (iii) was engaged in business or a transaction for which any property remaining with the Debtor was an unreasonably small capital at the time of, or as a result of entering into the Amended Credit Agreement.

225.    Upon information and belief, CJAG was insolvent on April 9, 2008.

226.    Based upon the foregoing, the Debtor's obligations to, in essence, guarantee CJAG's debts to Wells to the extent of the HCC LLC Guarantee, constitute an avoidable fraudulent transfer pursuant to section 548(a)(1)(B) of the Bankruptcy Code and, in accordance with section 550(a) of the Bankruptcy Code, and an Order should be

entered granting judgment in favor of Plaintiff and against HCC LLC, for the value of

the release of HCC LLC's Guarantee, in an amount not less than $4,250,000.

**SECOND CAUSE OF ACTION**
**AGAINST CJAG and BRAND MATTER**
**(Recovery of Value of Fraudulent Transfer**
**<u>Pursuant to 11 U.S.C. §§ 548(a) and 550)</u>**

227.    Plaintiff repeats, realleges and incorporates by reference the

allegations contained in paragraphs 1 through 226 of this Complaint as though set forth

at length herein.

228.    On April 9, 2008, the Debtor assumed an obligation to Wells that

had formerly been owed by CJAG by entering into the Amended Credit Agreement.

229.    The Debtor provided Wells with a security interest in substantially

all of the Debtor's assets to secure the obligations under the Amended Credit

Agreement.

230.    The Debtor entered into the Amended Credit Agreement within

two (2) years prior to the Petition Date.

231.    The Amended Credit Agreement exchanged Wells' security interest

in CJAG's intellectual property for a security interest in the Debtor's assets.

232.    Prior to the Debtor's entering into the Amended Credit Agreement,

CJAG's intellectual property was pledged to Wells as security for CJAG's payment of

obligations under the Original Credit Agreement (the "CJAG Security Interest").

233.    Upon information and belief, Wells released the CJAG Security

Interest in consideration for the Debtor entering into the Amended Credit Agreement

and for pledging its assets to secure payment under the Amended Credit Agreement.

32

234.    Upon information and belief, Wells would not have released its security interest in the CJAG intellectual property, absent the Debtor entering into the Amended Credit Agreement.

235.    In its report dated February 29, 2008, Houlihan Lokey valued CJAG's intellectual property at $25,500,000, all of which was subject to the CJAG Security Interest.

236.    The Debtor received less than reasonably equivalent value from CJAG for assuming its obligations under the Amended Credit Agreement.

237.    CJAG directly and materially benefitted from the Debtor's entering into the Amended Credit Agreement.

238.    On the same day CJAG and the Debtor entered into the Amended Credit Agreement, CJAG transferred its intellectual property to Brand Matter (the "CJAG IP Transfer").

239.    Brand Matter did not pay any reasonable equivalent value for the CJAG IP Transfer.

240.    For the reasons alleged above, the Debtor:  (i) was insolvent on April 9, 2008, or (ii) became insolvent as a result of entering into the Amended Credit Agreement;  or (iii) was engaged in business or a transaction for which any property remaining with the Debtor was an unreasonably small capital at the time of, or as a result of entering into the Amended Credit Agreement.

241.    Upon information and belief, CJAG was insolvent on April 9, 2008.

242.    Based upon the foregoing, the Debtor's obligations to Wells under the Amended Credit Agreement, to the extent of the value of the CJAG intellectual property, constitute an avoidable fraudulent transfer pursuant to section 548(a)(1)(B) of the Bankruptcy Code and, in accordance with section 550(a) of the Bankruptcy Code, an

Order should be entered granting judgment in favor of Plaintiff and: (i) against CJAG, for the value of the CJAG Security Interest, in an amount not less than $25,500,000; and (ii) against Brand Matter, as a mediate transferee, in an amount not less than $25,500,000.

## THIRD CAUSE OF ACTION
## AGAINST ETPH
### (Vicarious Liability of ETPH for Fashionology)

243.    Plaintiff repeats, realleges and incorporates by reference the allegations contained in paragraphs 1 through 242 of this Complaint as though set forth at length herein.

244.    Throughout the Relevant Period, ETPH was, and remains, the sole member of Fashionology.

245.    Throughout the Relevant Period, Fashionology was managed by its sole member.

246.    Fashionology had no independent board of directors, managers, or representatives.

247.    From the time Fashionology was formed, and at all times during the Relevant Period, ETPH used Fashionology as a mere extension of itself, as evidenced by, *inter alia*, that: (a) ETPH exercised exclusive domination and control over Fashionology; (b) ETPH used Fashionology as a mere instrumentality of itself; and (c) Fashionology failed to observe any corporate formalities.

248.    The Board made all board-level decisions for Fashionology.

249.    ETPH and Fashionology had common officers.

250.    Throughout the Relevant Period, ETPH as its sole member had the legal right to direct Fashionology's actions with respect to the transactions alleged in this Complaint.

34

251.    Throughout the Relevant Period, Fashionology acted as the agent of its principal and sole member, ETPH, with respect to the transactions alleged in this Complaint.

252.    ETPH caused Fashionology, as its agent, to participate or acquiesce in each of the transactions alleged in this Complaint.

253.    Based upon the foregoing, an Order should be entered granting judgment in favor of Plaintiff and holding ETPH liable for all sums for which Fashionology is liable to the Debtor as alleged in this Complaint.

**FOURTH CAUSE OF ACTION**
**AGAINST THE BOARD**
**(Breach Of Fiduciary Duty)**

254.    Plaintiff repeats, realleges and incorporates by reference the allegations contained in paragraphs 1 through 253 of this Complaint as though set forth at length herein.

255.    By virtue of their respective positions, a fiduciary relationship existed between each member of the Board and ETPH.

256.    The Debtor was in the zone of insolvency and/or insolvent from the time it was formed.

257.    Alternatively, the Debtor:  (i) was insolvent on April 9, 2008, or (ii) was rendered insolvent by the 2008 Transaction and the Amended Credit Agreement.

258.    By virtue of the Debtor's insolvency, the Board owed fiduciary duties to the Debtor and its creditors.

259.    As a fiduciary, each member of the Board was obligated by his duty of loyalty to act in a fully informed manner, and with the highest degree of good faith.

35

260.    As a fiduciary, each member of the Board was also obligated by his duty of care to act at all times using the amount of care that a reasonable person would use under similar circumstances.

261.    The Board breached their fiduciary duties to the Debtor and its creditors -- including the duties of loyalty and care -- and acted with gross negligence and recklessness by, *inter alia,* participating in one or more of the following:

a.    failing to investigate, inform themselves properly, or consider in any way, the effect of the 2008 Transaction on the Debtor and its creditors;

b.    failing to investigate, inform themselves properly, or consider in any way, the effect of the Amended Credit Agreement on the Debtor and its Creditors;

c.    failing to investigate, inform themselves properly, or consider in any way, the capitalization requirements of the Debtor;

d.    failing to investigate, inform themselves properly, or consider in any way, the effect of the Licensing Agreement on the Debtor and its creditors;

e.    failing to investigate, inform themselves properly, or consider in any way, the effect of allowing the Debtor's borrowing base under the Amended Credit Agreement to be used for loans made to CJAG on the Debtor and its creditors;

f.    failing to investigate, inform themselves properly, or consider in any way, the effect of allowing the Debtor to default on its obligations under the License Agreement on the Debtor and its creditors;

g.    failing to investigate, inform themselves properly, or consider in any way, strategies to cure the default to protect the license;  and

h.    failing to investigate, inform themselves properly, or consider in any way, the effect of the Surrender Agreement on the Debtor and its creditors.

262.    The Board breached their fiduciary duties to the Debtor and its creditors -- including the duties of loyalty and care -- and acted with gross negligence and recklessness by, *inter alia,* participating in one or more of the following:

a.      allowing the Debtor to enter into the Amended Credit Agreement of which $32,837,622 had already drawn by CJAG;

b.      allowing the Debtor to incur debts for the benefit of Fashionology, CJAG and ETPH for no consideration and to the detriment of the Debtor;

c.      failing to prevent CJAG from using the Debtor's availability under the Amended Credit Agreement and thereby decrease the Debtor's liquidity;

d.      allowing the Debtor to enter into the License Agreement;

e.      allowing the Debtor to default under the License Agreement;

f.      failing to take steps to cure the default under the License Agreement;  and

g.      allowing the Debtor to enter into the Surrender Agreement.

263.    The Debtor and its creditors were damaged by the aforementioned breaches of fiduciary duties.

264.    Based upon the foregoing breaches of fiduciary duties, an Order should be entered granting judgment in favor of Plaintiff, jointly and severally against each of the members of the Board, for an amount not less than $42,953,263.

### FIFTH CAUSE OF ACTION
### AGAINST THE MANAGERS
### (Breach Of Fiduciary Duty)

265.    Plaintiff repeats, realleges and incorporates by reference the allegations contained in paragraphs 1 through 264 of this Complaint as though set forth at length herein.

266.    By virtue of their respective positions, a fiduciary relationship existed between each of the Managers and the Debtor.

267.    As a fiduciary, each of the Managers was obligated by their duty of loyalty to act in a fully informed manner, and with the highest degree of good faith.

268.    As a fiduciary, each of the Managers was also obligated by his duty of care to act at all times using the amount of care that a reasonable person would use under similar circumstances.

269.    Each of the Managers breached their fiduciary duties to the Debtor -- including the duties of loyalty and care -- and acted with gross negligence and recklessness by, *inter alia,* participating in one or more of the following:

   a.    causing the Debtor to enter into the Amended Credit Agreement, which benefitted CJAG, HCC LLC, Brand Matter, ETPH and its investors and damaged the Debtor;

   b.    causing the Debtor to become undercapitalized;

   c.    causing the Debtor to enter into debts for the benefit of Fashionology, CJAG and ETPH for no consideration and to the detriment of the Debtor and its creditors;

   d.    failing to solicit, or investigate options for alternative financing where the Debtor would not have been obligated for CJAG's prior debt;

   e.    failing to prevent CJAG from using the Debtor's borrowing base under the Amended Credit Agreement to obtain loans for its sole and exclusive use;

   f.    causing the Debtor to enter into the License Agreement;

   g.    allowing the Debtor to default under the License Agreement;

   h.    failing to take necessary steps to cure the default under the License Agreement and thereby prevent the termination of the license;  and

   i.    causing the Debtor to enter into the Surrender Agreement.

270.    The Debtor and its creditors were damaged by the aforementioned breaches of fiduciary duties.

271.    Based upon the foregoing breaches of fiduciary duties, an Order should be entered granting judgment in favor of Plaintiff, jointly and severally against each of the Managers, for an amount not less than $42,953,263.

**SIXTH CAUSE OF ACTION**
**AGAINST BRAND MATTER**
**(Aiding and Abetting Breach Of Fiduciary Duty)**

272.    Plaintiff repeats, realleges and incorporates by reference the allegations contained in paragraphs 1 through 271 of this Complaint as though set forth at length herein.

273.    Brand Matter was formed as part of the 2008 Transaction.

274.    Brand Matter's sole member is ETPH.

275.    Brand Matter has no independent board of directors or representatives and is controlled by ETPH.

276.    Brand Matter is an affiliate of the Debtor.

277.    Brand Matter was formed, *inter alia*, to hold the intellectual property assets of the Ellen Tracy Brand.

278.    After the 2008 Transaction, Brand Matter repeatedly, substantially and knowingly participated in, induced, encouraged, substantially assisted, and/or aided or abetted the breaches of fiduciary duty committed by the Board, and of the Managers.

279.    Shortly after its formation, Brand Matter was the recipient of a transfer of the Ellen Tracy Intellectual Property, for which it paid no consideration to the Debtor.

280.    Upon information and belief, Brand Matter knew, at the time it received the Ellen Tracy Intellectual Property, that neither the Debtor's Managers nor its Board considered the effect of separating the operational assets from the intellectual property assets of the Ellen Tracy Business on the Debtor or its creditors.

281.    Upon information and belief, Brand Matter entered into the License Agreement, with full knowledge that the Board and the Managers allowed the Debtor to enter into the transaction -- which benefitted ETPH as the ultimate parent and upstream recipient of the revenues from the License Agreement -- without considering its effect on the Debtor or its creditors.

282.    Upon information and belief, Brand Matter also knowingly and substantially assisted the Managers and the Board by issuing the License Default Notice, and terminating the License Agreement.

283.    Upon information and belief, Brand Matter knew, at the time it issued the License Default Notice that neither the Managers nor the Board had considered the effect of the termination of the License Agreement on the Debtor or its creditors.

284.    Brand Matter damaged the Debtor and its creditors by aiding and abetting the Board and the Managers in their repeated breaches of fiduciary duties.

285.    Based upon the foregoing breaches of fiduciary duties, an Order should be entered granting judgment in favor of Plaintiff, against Brand Matter for aiding and abetting the Board and the Managers in multiple breaches of their fiduciary duties, in an amount not less than $42,953,263.

## SEVENTH CAUSE OF ACTION
## AGAINST BRAND MATTER
### (Equitable Disallowance or Subordination)

286.     Plaintiff repeats, realleges and incorporates by reference the allegations contained in paragraphs 1 through 285 of this Complaint as though set forth at length herein.

287.     Brand Matter is an affiliate of the Debtor.

288.     Brand Matter was formed, *inter alia,* to hold the intellectual property assets of the Ellen Tracy Brand.

289.     After the 2008 Transaction, Brand Matter repeatedly engaged in inequitable conduct with respect to the Licensing Agreement.

290.     Upon information and belief, Brand Matter, *inter alia,* entered into the License Agreement, with full knowledge that the Debtor would not have the ability to make the payments required under the License Agreement.

291.     Brand Matter's conduct damaged the Debtor, and caused substantial harm to the Debtor and its creditors.

292.     Based upon the foregoing, any claim or interest of Brand Matter in respect of the Debtor's estate should be equitably disallowed or, in the alternative, subordinated pursuant to § 510(c) of the Bankruptcy Code and other applicable law.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests entry of a Judgment as follows:

A.     On Plaintiff's First Cause of Action, in accordance with section 550(a) of the Bankruptcy Code, and in favor of the Plaintiff against HCC LLC, for the value of the HCC LLC Guarantee, in an amount not less than $4,250,000;

41

B.     On Plaintiff's Second Cause of Action, in accordance with section 550(a) of the Bankruptcy Code, and in favor of Plaintiff:  (i) against CJAG, for the value of the CJAG Security Interest, in an amount not less than $25,500,000;  and (ii) against Brand Matter, in an amount not less than $25,500,000;

C.     On Plaintiff's Third Cause of Action, in favor of Plaintiff and holding ETPH liable for all sums for which Fashionology is liable to the Debtor as alleged in this Complaint;

D.     On Plaintiff's Fourth Cause of Action, in favor of the Plaintiff and jointly and severally against each of the members of the Board for their multiple breaches of their fiduciary duties, for an amount not less than $42,953,263;

E.     On Plaintiff's Fifth Cause of Action, in favor of the Plaintiff and jointly and severally against each of the Managers for their multiple breaches of their fiduciary duties, for an amount not less than $42,953,263;

F.     On Plaintiff's Sixth Cause of Action, in favor of the Plaintiff and against Brand Matter for aiding and abetting the Board and the Managers in their multiple breaches of their fiduciary duties, in an amount not less than $42,953,263;

G.     On Plaintiff's Seventh Cause of Action, in accordance with section 510(c) of the Bankruptcy Code, and in favor of the Plaintiff and against Brand Matter equitably disallowing or, in the alternative, subordinating any claims of Brand Matter against the Debtor's Estate;  and

**(Concluded on the following page)**

H.      Granting Plaintiff such other and further relief as this Court may

deem just and proper.

DATED:  New York, New York
        October 5, 2011

                                ALBERT TOGUT, as the Chapter 7 Trustee for
                                the Estate of Ellen Tracy, by his attorneys,
                                TOGUT, SEGAL & SEGAL LLP,
                                By:


                                /s/ Frank A. Oswald
                                FRANK A. OSWALD
                                RICHARD K. MILIN
                                JONATHAN P. IBSEN
                                One Penn Plaza, Suite 3335
                                New York, New York  10119
                                (212) 594-5000